UNITED STATES DISTRICT COURT
NORTHERN  DISTRICT OF OHIO WESTERN DIVISION

NESTOR ALVAREZ, individually and on behalf of
K.A., a child with a disability,

                            *Plaintiffs,*

            -against-

                                                          Case No. 3:18-cv-01768

SWANTON LOCAL SCHOOL DISTRICT,

                    *Defendants.*

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT

CUDDY LAW FIRM, P.L.L.C.
*Attorneys for Plaintiffs*
6100 Oak Tree Blvd, Suite 200
Independence, Ohio 44131
(315) 370-4020
acuddy@cuddylawfirm.com

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . 6

I.    THE IDEA . . . . . . . . . . . . . . . . . . . . . 6

II.   THE DISTRICT SUBSTANTIVE AND PROCEDURALLY VIOLATED
      THE IDEA . . . . . . . . . . . . . . . . . . . . 8
      A.  The April 20, 2016 Meeting. . . . . . . . . . . . . . 8
      B.  The SRLO Correctly Found that Home Instruction Did Not
          Satisfy the Least Restrictive Environment Requirement . . . . . 12
      C.  The SLRO Erred in Applying a "No Regression" Standard in
          Defiance of Endrew F. . . . . . . . . . . . . . . . 12

III.  THE SUBSTANTIVE PROGRAM OFFERED BY THE SCHOOL DIS-
      TRICT WAS NOT REASONABLY CALCULATED TO CONFER ED-
      UCATIONAL BENEFIT UPON K.A. . . . . . . . . . . . . . 13

IV.   THE SRLO ERRED IN BLAMING THE DEPRIVATION OF EDUCA-
      TIONAL BENEFITS UPON THE PARENTS . . . . . . . . . . . 16

V.    ADDITIONAL ERRORS BY THE IHO . . . . . . . . . . . 19
      A.  The IHO Erred in Finding that the April 2016 IEP Meeting
          Constituted a FAPE . . . . . . . . . . . . . . . . 19
      B.  The IHO Erred in Finding that the IEP Team Appropriately
          Considered the Continuum of Services . . . . . . . . . . 20
      C.  The IHO Erred in Finding that the Student was Not Entitled
          to Various IEP Services Because She was on Home Instruction. . 21

VI.   COMPENSATORY SERVICES ARE WARRANTED . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

*A.K. v. Gwinnett County Sch. Dist.,* 62 IDELR 253 (11th Cir. 2014) . . . . . . . .  16

*Adams v. State,* 195 F.3d 1141 (9th Cir. 1999)  . . . . . . . . . . . . . . .  20

*Barnett v. Memphis City Sch.,* 113 F. App'x 124 (6th Cir. 2004)  . . . . . . . .  24

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,*
458 U.S. 176 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9, 10

*Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.,*
208 F.3d 560 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . .  8

*Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss,*
144 F.3d 391 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . .  9

*Deal v. Hamilton Cty. Bd. of Educ.,* 392 F.3d 840 (6th Cir. 2004) . . . . . . . . . . . . . . . 13–14

*Dong v. Bd. of Educ. of the Rochester Cmty. Sch.,* 197 F.3d 793 (6th Cir. 1999) . . . . . . . . . . 9, 10

*Endrew F. v. Douglas Cty. Sch. Dist. RE-1,* 137 S.Ct. 988 (2017) . . . . . . . . . . . . . . . 6–7, 12, 15

*Hall v. Knott County Bd. of Ed.,* 941 F.2d 402 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 24

*Honig v. Doe,* 484 U.S. 305 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Horen v. Board of Education,* 948 F.Supp.2d 793 (N.D.Ohio 2013) . . . . . . . . . . . . . . . . . 18

*Kings Local Sch. Dist., Bd. of Educ. v. Zelazny,* 325 F.3d 724 (6th Cir. 2003) . . . . . . . . . . 9

*Knable v. Bexley City Sch. Dist.,* 238 F.3d 755 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 8, 16

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.,*
397 F.3d 77 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McLaughlin v. Holt Pub. Sch. Bd. of Educ.,* 320 F.3d 663 (6th Cir. 2003) . . . . . . . . . . . . . . . 9

*Polk v. Cent. Susquehanna Intermediate Unit 16,* 853 F.2d 171 (3rd Cir. 1988) . . . . . . . . . . . . 14

*Reusch v. Fountain,* 872 F. Supp. 1421, 1425–26 (D. Md. 1994) . . . . . . . . . . . . . . . . . . . . . . 20

*Schaffer v. Weast,* 546 U.S. 49 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Somberg v. Utica Cmty. Sch.,* 908 F.3d 162 (6th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . 15–16

*Stamps v. Gwinnett County Sch. Dist.,* 59 IDELR 1 (11th Cir. 2012) . . . . . . . . . . . . . . . . . . 16

## PRELIMINARY STATEMENT

This is an appeal of the decision of a state-level review officer (SLRO) decision that upheld the decision of an impartial hearing officer (IHO) following an administrative hearing conducted pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* Plaintiff parent now brings this motion for summary judgment reversing the decision of the SLRO.

## STATEMENT OF FACTS

Kassandra A. ("K.") was born in 1999 and, during the 2015/16 school year, was placed at a self-contained ESC Multiple Disabilities classroom in Wauseon ("MD Unit"). Joint Ex. 2-1, 2-3.[1] K.A. has been diagnosed with speech apraxia and mild mental retardation. Joint Ex. 10, 15. She demonstrates deficits in cognitive, academic, communication and adaptive behavior skills. *Id.*

On April 13, 2015, K.'s father delivered a letter to the principal of Wauseon High School, expressing concerns about K.'s treatment by another student, Jeffrey T. ("J.") Parent Ex. 2.

The parent's letter stated:

> There is this boy named [J.] in one of her classes that have managed to get my daughter give our phone number and he have been calling our home to talk to her. On Saturday April 11, 2015, he called again and I ended up answering the phone. I didn't know who was calling, he asked for [K.A.] and wanted to talk to her. I asked who he was and be said his name was [J.] [J.] was very persistent wanting to speak to my daughter and forcing me to give him explanations as why I preffered [sic] not to let him speak to my daughter. I suspect that [J.] is trying make my daughter think she should have a boy/girlfriend relationship by giving my daughter a ring. Him and my daughter are far from understanding what relationships means.
>
> His annoying persistence forced me to tell him to let me speak to his parents. At first he was not cooperating with me. To my advise he finally consented me to speak to his mother. I briefly spoke with his mother and told her the situation and advised her to tell her son to stay away from my daughter. I have also told

_____

[1]Citations are to the exhibits entered into evidence at the hearing, with hearing transcript citations indicated as Tr. [volume], [page].

> [J.] to not make any kind of contact with my daughter and assured him that I wi11 speak with the School's Principal.
>
> I will appreciate that you advise [J.] NOT to make any contact with my daughter.
>
> My daughter's safety, her education, her success, and her happiness in life is very important to me.

Parent Ex. 2. K.A.'s father included the ring with his letter, and asked that it be returned to J. *Id.*

On March 16, 2016, an Individualized Education Program (IEP) Team convened for K.A.'s annual review. Joint Ex. 1. The team relied upon an Evaluation Team Report (ETR) completed on March 21, 2014. Joint Ex. 1-1. The team recommended individualized direct instruction and small group reinforcement from an intervention specialist, in a self-contained classroom, ten minutes daily for each of goals one through four, or 200 minutes weekly. Joint Ex. 1-17. It further recommended 3.5 monthly hours of community-based instruction to apply functional daily living skills, and three monthly hours of community education outings to generalize functional skills taught in the classroom and to learn about services and resources available in the community. *Id.* It also recommended two weekly hours of job shadowing with a job coach to learn vocational skills, 180 monthly minutes of work training to learn vocational skills, and 120 monthly minutes of speech and language services from a speech and language pathologist. Joint Ex. 1-17, 1-18. Additionally, the IEP provides for 80 monthly minutes of work-study in the form of small-group instruction, 30 monthly minutes of work-study in the form of direct observation and corrective verbal feedback, and four monthly hours of community-based instruction including therapeutic recreation. Joint Ex. 1-18. The IEP includes assistive technology and a forty-minute, monthly speech and language consultation with the classroom teacher. Joint Ex. 1-19.

Michael Vicars, the student services director at the Swanton Local Schools, oversees special education in the district. Tr. I, 31. He has been involved in developing K.A.'s programming since 2014, and testified that K.A. has cognitive and communications disabilities, and is a really nice kid. Tr. I, 53.

Mr. Vicars described the MD Unit classroom as having no more than eight students, with four paraprofessionals in the room. Tr. I, 72. He testified that the individualized direct instruction was recommended because, due to K.A.'s low cognitive ability, it is appropriate to meet her needs; furthermore, community-based instruction was recommended to help her develop skills for life after school. Tr. I, 73. K.A.'s ETR established that she needs speech services. Tr. I, 76.

Likewise, the community-based instruction including therapeutic services was intended to help K.A. develop social skills and learn to function in the community. Tr. I, 78. Class-room instruction was tied to these outings; for example, math was applied to calculation of prices at the movies and otherwise, and reading to interpreting restaurant menus. Tr. I, 79. Mr. Vicars testified that for K.A. to progress toward her transition goal, she would need the daily intervention specialist services, 180 minutes weekly, and 120 minutes of speech services weekly. Tr. I, 91. No evaluation reports exist that conclude that K.A. does not continue to require these services to make progress toward her goals. Tr. I, 98.

After finding sexually explicit text messages on K.A.'s social media, the parent contacted local police Tr. III, 155-156.  In an interview with police on May 3, 2016, J. admitted to incidents sexual in nature with K. within the multiple disability classroom. Parent Ex. 3-2. As a result of these alleged incidents, parent acted protectively by not returning his cognitively impaired daughter to the same class setting, and she remained out of school through the end of the school year. Tr. I, 159.

On April 20th, the parents came to the school building to return school property, including a choir robe. Tr. I, 157. The parents' appearance at the school led to an impromptu IEP Team meeting. Tr. I, 159.

The resulting IEP stripped away all school and community-based services, and related services, replacing K.'s program with four weekly hours of home tutoring. Joint Ex. 2-10. Mr. Vicars, in an email dated February 17, 2017, acknowledged that "[t]his tutoring thing is worthless[]" and that K.A. "is not doing anything that is working toward

3

graduation." Parent Ex. 21-2. Mr. Vicars testified that "there's no way that girl could ever get everything she needed through a tutor that was coming to her house five hours a week when she needed all those other specially designed services that we've been talking about for the last hour." Tr. I, 122. He also testified that "the tutoring was never the answer." Tr. I, 125.

On August 23, 2016, the IEP Team convened with the parents and their (former) attorney. Tr. I, 128. No IEP resulted from this meeting. Tr. II, 65–67.

On August 25, 2016, the parents expressed by letter the conditions upon which they would return K.A. to school:

> You MUST provide to us a promissory document acknowledging your responsibility to protect her, to keep her safe in school and give us the list of the personnel who will be instructing her. She must not go in outings
>
> She must not be exposed to any computers, any kind of communication devices including I-pads. She must not be placed in a job training environment, Not that I want our child to be lazy, NO!
>
> I want our daughter to learn how to write, read, understand well all her subjects, and speak well.
>
> Last. either my wife or myself will transport her to school and back home. She must stay in the office until we pick her up. We do NOT authorize anyone to pick her up unless there is a written consent from us, her parents.

Parent Ex. 4-3. The district refused to commit in writing to keeping K.A. safe in school. Tr. I, 127.

On September 21, 2016, Mr. Vicars attempted to secure speech services for K., as he believed that the district owed her 120 minutes per month of speech. Parent Ex. 13-1. Following discussion with the speech and language pathologist and an intervention specialist, the district staff concluded that the IEP would need to be amended to provide for speech. Parent Ex. 13-1 to 13-3. Despite this, and K.A.'s uncontroverted need for speech services, the district did not amend the IEP. Joint Ex. 6.

K.A. did not return to school until March 2017. Tr. I, 134. Mr. Vicars testified:

> Q So it's fair to say that [K.A.] was not receiving FAPE in 2015–'16 at the end of the year and 2016–'17 through March?
>
> A Absolutely.
>
> ...
>
> I've said that more than once.

Tr. I, 134.

On December 11, 2017, the parent filed a due process complaint with the district. Parent Ex. 1. The DPC alleged denials of a free appropriate public education for the 2015/16 and 2016/17 school years. Parent Ex. 1-4. At the disclosure conference, counsel for the parent indicated that he was withdrawing claims relating to the 2017/18 school year. Tr. DC, 22–26. IHO Matthew Rohrbacher conducted hearing dates on February 8, 9, 12 and 13, 2018.

On March 12, 2018, IHO Rohrbacher issued a decision. With respect to the 2016/17 school year, the IHO addressed the following issues:

a. Failure to have all necessary IEP team member [sic];

b. Failure to consider continuum of services;

c. Failure to educate students [sic] in her least restrictive environment;

d. Failure to implement necessary services in homebound program;

e. Failure to implement transition services in the homebound program;

f. Failure to provide physical education in the homebound program;

g. Failure to provide electives in the homebound program.

IHO Dec. at 11. The IHO ruled in favor of the district on all issues. The parents appealed the IHO's decision in its entirety to a state-level review officer (SLRO).

On July 6, 2018, the SLRO issued a decision, denying the parents' appeal. The SLRO "agree[d] that procedural violations were committed in the hastily organized IEP meeting in April of 2016," but did not believe they "arose to a denial of [a free

appropriate public education].” SLRO Decision at 7. His reasoning was (1) only one month remained in the school year; (2) the parents had abruptly removed K.A. from school; (3) the school district wanted to get some plan in place; (4) the parents signed off on the amended IEP, which provided tutoring services; and, (5) there was no evidence the student regressed during the last part of the school year. *Id.*

The SLRO also agreed that “home tutoring was clearly not the least restrictive environment” but found that the district offered “two alternatives in the fall of 2016 in much less restrictive environments[.]” SLRO Decision at 7. The SLRO incorrectly stated that “in August and September meetings, School District offered IEP’s [sic] reasonably calculated to provide educational benefit in a least restrictive environment[.]]] *Id.* In fact, no such IEPs appear in the record because no IEPs were produced at those meetings.

ARGUMENT

I.   THE IDEA

The IDEA is part of “an ambitious federal effort to promote the education of handicapped children.” *Board of Educ. v. Rowley,* 458 U.S. 176, 179 (1982). Under the IDEA, Congress offers federal funds to states that demonstrate that they have developed plans to assure all children with disabilities residing in the state a free appropriate public education. 20 U.S.C. § 1412(a)(1)(A). The IDEA’s education delivery system begins with the “individualized education program,” or IEP. *Honig v. Doe,* 484 U.S. 305, 311 (1988); see 20 U.S.C. § 1414(d). The IEP, which results from a collaboration between parents, educators, and district representatives, describes the child’s present educational performance, establishes annual goals and short-term objectives for improvements in that performance, and dictates the specially designed instruction and services to enable the child to meet those objectives. *Honig, supra.*

In *Endrew F. v. Douglas Cty. Sch. Dist. RE-1,* 137 S.Ct. 988, 2017 WL 1066260 (Mar. 22, 2017), the Supreme Court revisited a school district’s substantive obligation under the Individuals with Disabilities Education Act (IDEA). “Endrew attended school

in respondent Douglas County School District from preschool through fourth grade. Each year, his IEP Team drafted an IEP addressed to his educational and functional needs. By Endrew's fourth grade year, however, his parents had become dissatisfied with his progress. Although Endrew displayed a number of strengths—his teachers described him as a humorous child with a 'sweet disposition' who 'show[ed] concern[ ] for friends'—he still exhibited multiple behaviors that inhibited his ability to access learning in the classroom.' . . . Endrew would scream in class, climb over furniture and other students, and occasionally run away from school. He was afflicted by severe fears of commonplace things like flies, spills, and public restrooms. As Endrew's parents saw it, his academic and functional progress had essentially stalled: Endrew's IEPs largely carried over the same basic goals and objectives from one year to the next, indicating that he was failing to make meaningful progress toward his aims. His parents believed that only a thorough overhaul of the school district's approach to Endrew's behavioral problems could reverse the trend.  But in April 2010,  the school district presented Endrew's parents with a proposed fifth grade IEP that was, in their view, pretty much the same as his past ones. So his parents removed Endrew from public school and enrolled him at Firefly Autism House, a private school that specializes in educating children with autism." 2017 WL 1066260, at *7 (citations omitted). He did much better at Firefly. *Id.* '[S]ome six months after Endrew started classes at Firefly, his parents again met with representatives of the Douglas County School District. The district presented a new IEP. Endrew's parents considered the IEP no more adequate than the one proposed in April, and rejected it. They were particularly concerned that the stated plan for addressing Endrew's behavior did not differ meaningfully from the plan in his fourth grade IEP, despite the fact that his experience at Firefly suggested that he would benefit from a different approach." *Id.*

The Tenth Circuit upheld a district court finding that the IEP provided a free appropriate public education, or FAPE, as required by IDEA. That court reasoned that "it had long interpreted this language to mean that a child's IEP is adequate as long as it is calculated to confer an 'educational benefit [that is] merely . . . more than de minimis.'

7

798 F.3d, at 1338 (internal quotation marks omitted). Applying this standard, the Tenth Circuit held that Endrew's IEP had been 'reasonably calculated to enable [him] to make some progress.' " 2017 WL 1066260, at *8. The Supreme Court vacated the Tenth Circuit's decision. That court found that "a student offered an educational program providing 'merely more than de minimis' progress from year to year can hardly be said to have been offered an education at all." 2017 WL 1066260, at *12. Thus, the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

A school district's failure to comply with the procedural requirements of the IDEA is not a *per se* violation of the Act and only constitutes a denial of a FAPE "if such violation causes substantive harm to the child or his parents." *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 765 (6th Cir. 2001). Substantive harm occurs when a procedural violation "seriously infringe[s] upon the parents' opportunity to participate in the IEP process." *Id.* (citations omitted). Procedural violations that deprive an eligible student of an individualized education program or result in the loss of an educational opportunity will also constitute a denial of a FAPE. *Id.*, at 766.

II.    The District Substantive and Procedurally Violated the IDEA

The SLRO "agree[d] that procedural violations were committed in the hastily organized IEP meeting in April of 2016," but declined to find a denial of FAPE. SLRO Decision at 7. He further agreed that "home tutoring was clearly not the least restrictive environment for [K.A.'s] education[.]" *Id.* Nevertheless, the SLRO found in favor of the school district.

A.    *The April 20, 2016 Meeting*

The purpose of the IDEA is to give children with disabilities a free appropriate public education designed to meet their unique needs. *Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.,* 208 F.3d 560, 565 (6th Cir. 2000) (citing 20 U.S.C. § 1401(25), § 1412). As part of providing a FAPE, school districts receiving funds under the

8

IDEA are required to establish an IEP for each child with a disability. *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 762 (6th Cir. 2001) (citing 20 U.S.C. § 1414(a)(5)). The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Id.* at 763 (citing 20 U.S.C. § 1401(a)(20)).

The term "free appropriate public education" means special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 188–89 (1982).

A court's inquiry in matters brought pursuant to the IDEA involves two distinct elements. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. *Rowley, supra; McLaughlin v. Holt Pub. Sch. Bd. of Educ.,* 320 F.3d 663, 669 (6th Cir. 2003). Second, the court must assess whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits. *Rowley, supra,* 458 U.S. at 206–07; *McLaughlin, supra,* 320 F.3d at 669. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley, supra,* 458 U.S. at 207; accord *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny,* 325 F.3d 724, 729 (6th Cir. 2003). Parties challenging an IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate. *Schaffer v. Weast,* 546 U.S. 49 (2005).

With regard to procedural matters, the court should "strictly review an IEP for procedural compliance," although technical deviations will not render an IEP invalid. *Dong v. Bd. of Educ. of the Rochester Cmty. Sch.,* 197 F.3d 793, 800 (6th Cir. 1999); see *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss,* 144 F.3d 391, 398 (6th Cir. 1998) (noting that "minor technical violations may be excused"). Only if a procedural violation has resulted in substantive harm, and thus constitutes a denial of a FAPE, may relief be granted. *Id.* The Supreme Court has emphasized the importance Congress attached to the IDEA's procedural safeguards:

> [T]he congressional emphasis upon full participation of concerned parties through- out the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley, supra,* 458 U.S. at 206. "If the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." *Dong, supra,* 197 F.3d at 800.

Here, the district conducted a meeting on April 20, 2016, at which it stripped all special education and related services from K.'s IEP without any evaluative support. Tr. I, 159; Joint Ex. 2-10. Mr. Vicars, the district representative, was not present; nor did a general education teacher attend the meeting. Joint Ex. 2-11. The federal regulations require "[n]ot less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)" and "[a] representative of the public agency who - (i) Is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities; (ii) Is knowledgeable about the general education curriculum; and (iii) Is knowledgeable about the availability of resources of the public agency." 34 C.F.R. § 300.321(a)(2), (4).

No speech provider was present at a meeting during which the district removed all speech services from the student's IEP. 34 C.F.R. § 300.321(a)(6) ("other individuals who have knowledge or special expertise regarding the child, including

related services personnel as appropriate"). That the meeting was held on essentially no notice deprived the parents of the opportunity to obtain the participation of other individuals, such as the speech provider, who likely would have argued against terminating speech services.

When a child, as with this child, reaches the age where she qualifies for transition services, the IEP Team must include transition services participants:

> (a) In accordance with paragraph (I)(1)(g) of this rule, the school district must invite a child with a disability to attend the child's IEP team meeting if a purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child in reaching those goals under paragraph (H)(2) of this rule.
>
> (b) If the child does not attend the IEP team meeting, the school district must take other steps to ensure that the child's preferences and interests are considered.

OAC 3301-51-07(I)(2)(a) & (b). The April 2016 meeting violated this requirement as well. Joint Ex. 2-10 (April meeting did not include student); Tr. I, 159 (meeting held on no notice). Had the district complied with the regulatory notice requirement, it presumably could have invited the student, but it did not. OAC 3301-51-07(J).

Parent counseling and training means "assisting parents in understanding the special needs of their child;…Providing parents with information about child development; and…Helping parents to acquire the necessary skills that will allow them to support the implementation of their child's IEP or IFSP." 34 C.F.R. § 300.34(c)(8). The question of whether K. would benefit if her parents were provided parent counseling and training was not discussed by the IEP Team, which denied the parent meaningful participation in the IEP development process and thus denied K. a FAPE.

The SLRO did not make any express findings with regard to these violations, but acknowledged that "procedural violations were committed" but did not constitute a denial of FAPE. SLRO Decision at 7. The Court should find that these violations denied K.A. a FAPE. As discussed below, the SLRO applied the wrong standard to the educational harm suffered by K.A., finding only that she did not regress, and not that the home program was reasonably calculated for her to make progress under *Endrew F.*

11

B.    *The SRLO Correctly Found that Home Instruction Did Not Satisfy the Least Restrictive Environment Requirement*

The IHO stated that "it was the Petitioner's choice was [sic] to place KA in the most restrictive environment. The record did not support that Petitioner was open to any other option and the burden of persuasion on the placement issue rests totally with the Petitioner. Mr. [A.] seems to want to suggest that Mr. Vicars who was not physically present at the meeting on April 20, 2016 should have suggested at that time the Swanton High School setting, as it would have been less restrictive than home instruction. The amended IEP was envisioned to only continue until the end of school year (Jt. Ex. 2, SWAN00132) which was roughly 5 weeks away." IHO Dec. at 13.

The IHO contradicts himself in stating that (1) the record did not support that the parent was open to any other option, but (2) the district should have offered Swanton High School. He brushes off the significance of the overly restrictive offer, claiming that it was only for five weeks, when it actually continued for nearly a year. The SLRO correctly found that the home setting was not the least restrictive environment. SLRO Decision at 7.

C.    *The SLRO Erred in Applying a "No Regression" Standard in Defiance of Endrew F.*

As noted above, under *Endrew F.,* the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 2017 WL 1066260, at *12. The SLRO reasoned that the myriad procedural violations leading to the home instruction setting in April 2016 did not deny K.A. a FAPE because, in part, there was no evidence the student regressed during the last part of the school year. SLRO Decision at 7. This "no regression" standard has no basis in law; rather, the record is crystal clear that the home setting was not reasonably calculated to enable K.A. to make progress appropriate in light of her circumstances.

Mr. Vicars, in an email dated February 17, 2017, acknowledged that "[t]his tutoring thing is worthless[]" and that K.A. "is not doing anything that is working

12

toward graduation." Parent Ex. 21-2. Mr. Vicars testified that "there's no way that girl could ever get everything she needed through a tutor that was coming to her house five hours a week when she needed all those other specially designed services that we've been talking about for the last hour." Tr. I, 122. He also testified "the tutoring was never the answer." Tr. I, 125. The SLRO simply ignored the testimony of the district's student services director in applying an incorrect legal standard to the question of whether the procedural violations caused substantive harm.

III.  THE SUBSTANTIVE PROGRAM OFFERED BY THE SCHOOL DISTRICT WAS NOT REASONABLY CALCULATED TO CONFER EDUCATIONAL BENEFIT UPON K.A.

The Supreme Court requires "that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley, supra,* 458 U.S. at 200–01. The Court rejected the argument that school districts are required to provide services "sufficient to maximize each child's potential commensurate with the opportunity provided other children." *Id.* at 198. The educational benefit provided, however, must be "meaningful." *Deal v. Hamilton Cty. Bd. of Educ.,* 392 F.3d 840, 862 (6th Cir. 2004) compare *Polk v. Cent. Susquehanna Inter- mediate Unit 16,* 853 F.2d 171 (3rd Cir. 1988). In light of *Endrew F.,* the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 2017 WL 1066260, at *12.

In *Deal,* the Sixth Circuit emphasized the critical importance of self-sufficiency in gauging whether educational benefits are in fact meaningful:

> At the very least, the intent of Congress appears to have been to require a program providing a meaningful educational benefit towards the goal of self- sufficiency, especially where self-sufficiency is a realistic goal for a particular child. Indeed, states providing no more than some educational benefit could not possibly hope to attain the lofty goals proclaimed by Congress. In evaluating whether an educational benefit is meaningful, logic dictates that the benefit "must be gauged in relation to a child's potential." *Polk,* 853 F.2d at 185. Only by considering an individual

13

child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement. In conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children.

392 F.3d at 864. The Court also observed that "[t]he implication from these manifestations of congressional intent might be that, where self-sufficiency is a realistic goal for a child, a program that *maximizes the possibility of self-sufficiency could be required*." *Id.,* footnote 17 (emphasis added). The *Deal* court relied, in part, on the Third Circuit's reasoning in *Polk*:

> The EHA's sponsors stressed the importance of teaching skills that would foster personal independence for two reasons. First, they advocated dignity for handicapped children. Second, they stressed the long-term financial savings of early education and assistance for handicapped children. A chief selling point of the Act was that although it is penny dear, it is pound wise—the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens.
>
> ...
>
> [T]he emphasis on self-sufficiency indicates in some respect the quantum of benefits the legislators anticipated: they must have envisioned that significant learning would transpire in the special education classroom— enough so that citizens who would otherwise become burdens on the state would be trans- formed into productive members of society.

*Polk,* 853 F.2d at 181–82, cited in *Deal, supra,* at 863, footnote 16. Application of these principles to K.A.'s case clearly requires a finding that the school district's proposed pro- gram did not offer a free appropriate public education.

The testimony of Michael Vicars makes clear that the program of home instruction, without related services or community involvement, does not provide K.A. with a FAPE. He testified that K.A. requires the following to make progress toward her annual goals and transition goal:

- daily intervention specialist services (Tr. I, 91);

14

- speech and language services (Tr. I, 91);

- community-based instruction including therapeutic services (Tr. I, 78);

He conceded that no evaluation supported removing these services, nor putting K.A. on home instruction. Tr. I, 98.

The most recent ETR strongly supports the need for these services. Joint Ex. 15. The IEP Team concluded that K.A. "demonstrates deficits in her cognitive, academic, communication and adaptive behavior skills. Additionally, she has diagnoses of speech apraxia and mild mental retardation. She demonstrates a need for modified, specially designed instruction." Joint Ex. 15-51.

The speech evaluator stated that K.A.'s "current level of speech and language skills would make it difficult for her to successfully complete grade level academic curriculum. Academic course work will need to be significantly modified for [K.A.] to successfully access all academic subject areas including reading and writing as well as social interactions with others in her environment." Joint Ex. 15-40. The intervention specialist stated that K.A. "needs to continue to participate in a curriculum that is significantly modified from that of her typical 8th grade peers, focusing in functional academic and daily living skills." Joint Ex. 15-9.

In an email dated February 17, 2017, Mr. Vicars acknowledged that "[t]his tutoring thing is worthless[]" and that K.A. "is not doing anything that is working toward graduation." Parent Ex. 21-2. Mr. Vicars also testified that "there's no way that girl could ever get everything she needed through a tutor that was coming to her house five hours a week when she needed all those other specially designed services that we've been talking about for the last hour[]" and that "the tutoring was never the answer." Tr. I, 122, 125.

Mr. Vicars testified:

> Q So it's fair to say that [K.A.] was not receiving FAPE in 2015–'16 at the end of the year and 2016–'17 through March?
> A Absolutely.
> ...
> I've said that more than once.

Tr. I, 134.

There can be no question that the change to home instruction substantively denied K. a FAPE. The SLRO did not address whether the home program was reasonably calculated to offer more than minimal benefit, as required by *Endrew F.,* but did acknowledge that it "was clearly not the least restrictive environment[,]" which would similarly result in a denial of FAPE. SLRO Decision at 7; *Somberg v. Utica Cmty. Sch.,* 908 F.3d 162, 169 (6th Cir. 2018) (IDEA's least-restrictive-environment requirement "provides that school districts must educate students with disabilities alongside students without disabilities to the maximum extent possible").

IV.  THE SRLO ERRED IN BLAMING THE DEPRIVATION OF EDUCATIONAL BENEFITS UPON THE PARENTS

Despite acknowledging procedural violations and the substantive inappropriateness of the recommended IEP, the SLRO found in favor of the school district by blaming the parent for the deprivation of FAPE. *Knable v. Bexley* slams the door on any potential "blame the parent" argument. In that case, "the district court held that, 'based on a preponderance of evidence in the record, any procedural violations committed by Bexley or the aggregation of the violations did not result in the denial of an FAPE.' In reaching its conclusion, the district court emphasized that Bexley had afforded the Knables opportunities to become involved in the process of formulating an IEP for Justin." 238 F.3d at 766. The Sixth Circuit found it "true that Bexley met with the Knables on several occasions to discuss Justin's behavioral problems and to review possible placement options for him. The record also reflects that Bexley worked with the Knables to ease Justin's transition from Upham Hall back to Bexley in February 1994. Such cooperation, however, is not the equivalent of providing parents a meaningful role in the process of formulating an IEP." *Id.* "Bexley's assertion that the school district was unable to conduct an IEP meeting until the Knables had agreed to a placement for Justin does not excuse its failure to conduct an IEP conference. Because there was no IEP conference, Mr. and Mrs. Knable were denied any meaningful opportunity to participate in the IEP process." *Id.*

Courts and hearing officers have consistently held that home placements based

16

solely on parent preference are not appropriate. See, e.g., *A.K. v. Gwinnett County Sch. Dist.,* 62 IDELR 253 (11th Cir. 2014, unpublished), cert. denied, 114 LRP 43723, 135 S. Ct.  78 (2014) (Parents' wish to administer nonprescription nutritional supplements to an 11- year-old girl with multiple, severe disabilities during the school day did not outweigh the student's need to interact with same-age peers); *Stamps v. Gwinnett County Sch. Dist.,* 59 IDELR 1 (11th Cir. 2012, unpublished), cert. denied, 112 LRP 54652 , 133 S. Ct. 576 (2012) (Parent's fear that three siblings with an immune disorder would become sick at school did not relieve the district of its responsibility to offer FAPE in the LRE); *Cheyenne Mountain Sch. Dist. #12,* 110 LRP 44427 (SEA CO 04/19/10) (Parents' concerns that a student might have a seizure during the 2.4 mile trip to school in a small school bus did not demonstrate that homebound placement was necessary); *Poway Unified Sch. Dist.,* 53 IDELR 208 (SEA CA 2009) (Parent's preference for keeping a 15-year-old with autism, an intellectual disability, and "leaky gut syndrome" at home based on her unsupported belief that a school-based placement posed too many health and safety risks was contrary to the goals of the IDEA); *Metropolitan Sch. Dist. of Lawrence Twp.,* 36 IDELR 282 (SEA IN 2002) (Home instruction was inappropriate for a student with autism because the student had no contact with other children.); and *Lafayette Sch. Corp.,* 30 IDELR 736 (SEA IN 1999) (rejecting parents' preferred home placement as unduly restrictive when the district could provide a full-day treatment program at a hospital).

The type of services provided to a student with a disability in the home also must be based on a student's needs. Districts that have denied certain services to students with disabilities on the grounds that they are not available to students on home instruction have been held liable for a denial of FAPE. See, e.g., *Abington Heights Sch. Dist.,* 112 LRP 16163 (SEA PA 03/13/12) (A district confused "homebound" services available to all students with in-home instruction provided under the IDEA; it should have ensured that a teenager with multiple medical and neurological conditions had access to the content areas of the general education curriculum, including science and social studies); and *Cincinnati City Sch. Dist.,* 111 LRP 67197 (SEA OH 08/30/11) ("If the IEP team believes that the student requires occupational therapy and physical

therapy, the IEP team must include these services regardless of the student's placement on home instruction").

Here, the parents were clearly concerned regarding the allegations that J had engaged in sexually explicit conduct with K.A. at school, and demanded assurances that she would be safe upon her return Parent Ex. 4-3. The parents' reasonably relied on the content from the police report, which provided graphic detail regarding the sexual acts that J admitted he performed on K.A., and acted protectively by not returning K.A. to the very school and classroom where these alleged incidents occurred. That the district staff believed that the parents would not return K.A. to school, absence written assurances of her safety, does not excuse the school district from offering K.A. a FAPE. In fact, the IEP Team convened on August 23rd, but its failure to make a recommendation at that meeting renders it comparable to the meetings held with the Knables—a discussion of placement options, rather than an IEP meeting. Tr. II, 65–67.

The case relied upon by the SLRO, *Horen v. Board of Education,* 948 F.Supp.2d 793 (N.D.Ohio 2013), is completely inapplicable to this child's situation. Importantly, in *Horen,* the parents (one of whom was an attorney) "acted to frustrate formation of an IEP[,]" by failing "to fulfill their duty to participate in the IEP process, and thereby impair[ing] that process irredeemably." *Id.*, at 805–806. The parents alleged a denial of FAPE based upon the district's failure to create an IEP where they intentionally impeded the IEP development process. *Id.*, at 803.

This Court is fully familiar with the antics of the Horens. The school district repeatedly scheduled IEP meetings, and the Horens refused to participate unless the district complied with their demands that the meeting be recorded and that the school district's attorney not be present. 948 F.Supp.2d at 806.

Cooperation in the IEP process does not require blind acquiescence to the school district's position. Unlike the Horens, these parents did attend the IEP meetings held in August and September 2016; they simply did not agree with the district's placement suggestions. This did not frustrate the ability of the district to prepare an appropriate IEP. Similar to the situation in *Knable,* the district still had an obligation to offer an

18

appropriate program in the least restrictive environment, in the form of a written IEP, and elected not to do so. As such, the Court should reverse the SLRO's decision in its entirety and award compensatory education.

V.  ADDITIONAL ERRORS BY THE IHO

The SLRO did not address all the issues raised before him. The following are errors by the IHO either not directly addressed or not addressed at all.

A.  *The IHO Erred in Finding that the April 2016 IEP Meeting Constituted a FAPE*

The IHO found that "[t]he regular education teachers did not attend the IEP meetings in March of 2016 or the amended IEP of April of 2016. Those teachers appear to teach art and choir and since they didn't testify we do not have any way of determining if their absence from the meeting created a substantive violation of the procedures required." IHO Dec. at 11. The IHO acknowledged that, in 2014, K.A. "attended the regular education gym and choir classes at Wauseon High School[]" and that during the 2015/16 school year, K.A. "was receiving regular education in the areas of art and choir[,]" but those teacher did not attend the March 2016 IEP meeting. IHO Dec. at 5.

The Ohio regulations require the presence of "[n]ot less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)" at each IEP meeting. OAC 3301-51-07(I)(1)(b). The IEP must include "program modifications or supports for school personnel that will be provided to enable the child[] . . . [t]o be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities[] and . . . [t]o be educated and participate with other children with disabilities and nondisabled children in the activities described in this rule[.]" OAC 3301-51-07(H)(1)(e)(ii) & (iii).

Here, then, a procedural violation clearly occurred. The IHO, however, ignores the substantive impact of the teachers' absence on parental participation in the meeting. The parent was unable to inquire as to modifications necessary to ensure that K.A. had a reasonable opportunity to succeed in her general education classes. He was

further unable to question the teachers about K.A.'s social progress in the presence of her typically-functioning peers. It is unclear how the testimony of the teachers at the hearing would be necessary to resolve these issues. The absence of mandatory members significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to K. as it prevented him from freely questioning the teachers about *his* concerns (which have not dovetailed with the *district's* concerns). 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

As such, the absence of the general education teachers denied FAPE. The SLRO did not address this issue directly.

B.     *The IHO Erred in Finding that the IEP Team Appropriately Considered the Continuum of Services*

The IHO states that "[i]n [sic] that April meeting which was necessitated as a result of the parent having removed his child from school a number of days earlier, there would have been only one proper placement that provided a less restrictive environment which was the then current placement (ESC MD Unit) and since the parent would not allow the same other choices were limited." IHO Dec. at 12. Here, the IHO is endorsing the district's predetermined "take it or leave it" placement at the MD Unit and absolving the district from considering any other placements despite the clear and present danger to K.A. that she would be sexually molested again if returned to that placement.

Another circuit has held that "safety concerns may be considered in the development and review of" a student's IEP. *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.,* 397 F.3d 77, 94 (2d Cir. 2005). That court's "comports with common sense given that some infirmities will likely render disabled children more vulnerable to injury from certain conditions than their non-disabled peers, therefore requiring special accommodations to fulfill the statutory preference for educating such children together to the maximum extent possible." *Id.*, at 93.

Placement decisions must be based on a student's unique needs as reflected in the IEP, rather than IEPs developed on the basis of services already available in the

district. 34 C.F.R. § 300.116(b)(2); see *Adams v. State,* 195 F.3d 1141, 1150–51 (9th Cir. 1999); *Reusch v. Fountain,* 872 F. Supp. 1421, 1425–26 (D. Md. 1994). The U.S. Education Department has commented that "[a]lthough the Act does not require that each school building in an LEA be able to provide all the special education and related services for all types and severities of disabilities, the LEA has an obligation to make available a full continuum of alternative placement options that maximize opportunities for its children with disabilities to be educated with nondisabled peers to the extent appropriate. In all cases, placement decisions must be individually determined on the basis of each child's abilities and needs and each child's IEP, and *not solely on factors such as* category of disability, severity of disability, *availability of special education and related services,* configuration of the service delivery system, availability of space, or administrative convenience." 71 F.R. 46588 (emphasis added); see also *Application of a Student with a Disability,* Appeal No. 12- 156 (SEA NY 2012) ("I remind the district that placement decisions must be based on a student's unique needs as reflected in the IEP, rather than IEPs developed on the basis of services already available in the district").

The IHO thus endorsed a policy that forced the parent to decide between a setting where his cognitively impaired daughter had been subject to sexual acts, and no setting at all. The district cannot simply deny a child a placement because it does not have a suitable setting available, as in this case. The failure to consider any school setting except the MD Unit denied the student a FAPE. The SLRO did not address this issue directly.

C.    *The IHO Erred in Finding that the Student was Not Entitled to Various IEP Services Because She was on Home Instruction*

According to the IHO, "[a]s a result of what was offered in that IEP the issues of not pro- viding physical education, electives, transitional or vocational services were not necessary in providing FAPE while KA was on homebound instruction." IHO Dec. at 13. This runs counter to the IDEA, which mandates transition services for students K.A.'s age. OAC 3301-51-07(H)(2) ("Beginning not later than the first IEP to be in

21

effect when the child turns fourteen, or younger if determined appropriate by the IEP team, and updated annually, thereafter, the IEP must include: (a) Appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, and, if assessment data supports the need, independent living skills; (b) Appropriate measure- able post-secondary goals based on age-appropriate transition assessments related to integrated employment in a competitive environment; and (c) The transition services (including courses of study) needed to assist the child in reaching those goals.")

The Ohio implementing regulations define transition services in great detail:

"Transition services":

(a) Means a coordinated set of activities for a child with a disability that:

(i) Is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(ii) Is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and includes:

(a) Instruction;

(b) Related services;

(c) Community experiences;

(d) The development of employment in an integrated competitive environment and other post-school adult living objectives; and

(e) When assessment data supports a need, acquisition of daily living skills and provision of a functional vocational evaluation.

OAC 3301-51-01(B)(65)(a). These services "[s]hall be provided by individuals who have the competencies, experiences, and training to meet the individual student's transition service needs. Individuals coordinating transition shall either:

(i) Obtain the Transition to Work endorsement; or

(ii) Possess the skills and knowledge to:

(a) Facilitate a planning process among multiple agencies, students and families to support a student's secondary transition process;

(b) Plan for the collection, sharing and utilization of student's transition

22

data that is relevant to the student's post school outcomes, environment and support needs;

(c) Communicate a student's individual transition plan to students, families, educators and agencies;

(d) Coordinate the implementation research based practices that lead to effective postsecondary transition services and outcomes;

(e) Utilize methods to engage students and families in the secondary transition process;

(f) Assist in the coordination of referral process from school to adult services systems;

(g) Link appropriate course of study and instruction strategies to secondary transition related goals; and

(h) Create strategies that support the career development pathways of students with disabilities leading to career and college readiness.

OAC 3301-51-01(B)(65)(b). The April 2016 IEP simply deprived K.A. of these critical services. If this multiply disabled child is to have any chance to function independently, as envisioned by the IDEA, she must be provided a robust transition plan. 20 U.S.C. § 1400(c)(1) ("Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.")

The IHO also incorrectly decided that K.A. was not entitled to physical education as part of a FAPE. The Ohio regulations, however, define "special education" as including "[i]nstruction in physical education." OAC 3301-51-01(B)(60)(a)(i)(b). "Physical education" means:

(a) The development of:

(i) Physical and motor fitness;

(ii) Fundamental motor skills and patterns; and

(iii) Skills in aquatics, dance, and individual and group games and sports (including intramural and lifetime sports); and

(b) Includes special physical education, adapted physical education, movement education, and motor development.

OAC 3301-51-01(B)(60)(b)(ii). The regulations further state that "[p]hysical education services, specially designed if necessary, must be made available to every child with a

23

dis- ability receiving FAPE, unless the school district enrolls children without disabilities and does not provide physical education to children without disabilities in the same grades." OAC 3301-51-02(I)(1). Also, "[t]he school district responsible for serving a child with a disability who is enrolled in a separate facility must ensure that the child receives appropriate physical education services in compliance with this rule." OAC 3301-51-02(I)(4).

While the IHO also decided that K.A. was not entitled to electives, the regulations disagree. "Each school district must take steps to ensure that children with disabilities served by the school district have available to them the variety of educational programs and services available to nondisabled children in the area served by the school district, including art, music, industrial arts, consumer and homemaking education, and vocational education." OAC 3301-51-02(J).

On every issue, the IHO is just wrong. Transition services, physical education, and access to electives are all mandatory elements of a FAPE in Ohio. The IHO cannot simply brush aside these requirements, and erred in finding that K.A. was not entitled to them. The SLRO did not address these issues directly.

VI.    COMPENSATORY SERVICES ARE WARRANTED

In *Hall v. Knott County Bd. of Ed.,* 941 F.2d 402, 407 (6th Cir. 1991), the Sixth Circuit found that "the court could appropriately award judgment for what it would now cost her to obtain the educational services she says she ought to have received earlier[.]" Similarly, in *Barnett v. Memphis City Sch.,* 113 F. App'x 124, 127 (6th Cir. 2004), the circuit found that a court may award compensatory services to a child even when the child would receive those services after the age of twenty-one.

In this case, the IEP Team had discussed placing K.A. in the Penta careers program once she completed her academic course of study. Tr. I, 59.  Due to the district's failure to offer a program, K.A. lost essentially a full school year of academic, speech and social skills training, which should have been provided in accordance with the March 2016 IEP. The Court should award makeup services in the amount of one year's worth of services consistent with the March 2016 IEP, namely intervention specialist services, speech, community-based instruction, work study, transition services

and therapeutic recreation in the amounts that K.A. would have received under the March 2016 IEP.  Joint Ex. 1-17 to 1-19.

K.A. is turning nineteen shortly after the 2017/18 school year concludes. For her to receive her makeup academic, community and speech services and still maintain eligibility to complete the two-year Penta program (or a similar program), the Court should extend her eligibility for special education services as additional relief, to ensure that she receives all the services she would have received but for the denial of FAPE during 2015/16 and 2016/17.

No equitable factors bar an award of relief in this case. The parents attended the March 2016, April 2016 and August 2016 meetings. Joint Ex. 1, 2, 5. The parents did not refuse consent to evaluate. Tr. IV, 37. Likewise, they never refused to attend a meeting. *Id.* As such, they fully cooperated with the district's procedures, so K.A. should not be deprived of relief on equitable grounds.

## CONCLUSION

Based on the foregoing, the Court should reverse the decision of the SLRO, award compensatory education, and grant such further relief as the Court deems just and proper.

Dated: Auburn, New York
     January 3, 2020

          Respectfully submitted,

          /s/ Andrew K. Cuddy
          CUDDY LAW FIRM, PLLC
          *Attorneys for Plaintiffs*
          6100 Oak Tree Blvd, Suite 200
          Independence, Ohio 44131
          (315) 370-4020

Andrew K. Cuddy, Esq.
Jason H. Sterne, Esq.
*Of counsel*